## CITY OF DALLAS v. LOVE. (No. 10641.)*

Court of Civil Appeals of Texas. Dallas. Jan. 4, 1930.

Rehearing Denied Jan. 7, 1930.

J. J. Collins, City Atty., and A. A. Long, W. H. Knight, and H. P. Kucera, Asst. City Attys., all of Dallas, for appellant.

H. Bascom Thomas, Jr., and W. J. Rutledge Jr., both of Dallas, for appellee.

*Writ of error granted.

LOONEY, J. This suit was brought by Thomas B. Love, as next friend for and on behalf of Neota Camp and Nora Lee Meyer, residents of Dallas county, Tex., Ruth Patillo, a resident of Fannin county, Tex., Mildred Bryan, a resident of Rockwell county, Tex., Opel Allman and Juanita Allman and Harris Van Zant, residents of Tarrant county, Tex., minors and students of high school grade, also on behalf of all other minor scholastics similarly situated, for injunctive relief to compel the city of Dallas and her municipal and school authorities to obey the provisions of chapter 181, Acts Regular Session of Fortieth Legislature (1927), and as amended by the Forty-First Legislature (1929) at its first called session (chapter 2, p. 2, Session Acts, being now article 2678a, Vernon's Ann. Civ. Stats., Supplement of 1929). The suit was instituted less than 30 days before the amendment became effective, but this fact is not material, because the provisions called in question, of both the original and the amended acts, are in substance the same.

This statute requires the county board of school trustees, each year, to classify all schools of the county into elementary and high schools, and, if it should result that a high school student cannot receive instruction in his home district, then he is entitled to be enrolled and graded by the superintendent of the high school he chooses to attend, and shall receive instruction therein; his tuition for the time he may attend shall be paid by warrants drawn by the board of trustees of the district of his residence, on funds belonging to said district.

Following these provisions, the act reads: "The rate of tuition charged said pupil shall be the actual cost of teaching service, based upon the average monthly enrollment in the high school attended, exclusive of all other current or fixed charges, not to exceed $7.50 per month [$5.00 in the original act]. Said tuition rate shall be agreed upon between the board of trustees of the district in which such high school is located and the county board of school trustees, or in the event of their disagreement shall be fixed by the State Superintendent of Public Instruction subject to appeal to the State Board of Education * * * Provided the receiving district maintaining such a high school shall not be required to accept such a high school transfer as provided in this Act, unless and until such sending district shall have provided for the assessment and collection of a local tax not less than fifty cents on the one hundred dollars valuation of taxable property within such district." Other provisions of the act are not called in question, and will not be noticed.

The high school students named above were and are eligible for enrollment in the high schools maintained by defendant, under the provisions of the statute, and were and are entitled to receive training therein, if these provisions are valid and constitutional. In fact, prior to the institution of this suit, these students were regularly enrolled and given training in said schools, but the board of education of the city refused to abide by the arbitrary charge of $5 per month fixed in the original act, and demanded and collected from each student, as a condition precedent to their right to attend the schools, a tuition charge of $5 per month additional. The students paid the additional charge under protest, but demanded the right to attend and receive instruction under the very terms of the statute, and, as their demand was refused, the question at issue was appealed by them to, and was decided in their favor by, the state superintendent of public instruction, and his decision was affirmed by the state board of education. The superintendent thereupon directed the board of education of the city of Dallas to discontinue making the excess charge, but, believing the provisions of the statute in question were unconstitutional, and therefore that the order of the superintendent was unauthorized, they continued to collect the excess charge, and will in the future demand and collect from nonresident high school students, as a condition precedent to their right to attend the high schools of said city, the payment of an excess charge, which, added to the sum received otherwise, under the provisions of the statute, will equal $10 per month per student.

On hearing, the court granted plaintiffs a permanent injunction restraining the city and its school authorities from collecting tuition for schooling plaintiffs, or other high school students similarly situated, except as provided in article 2678a of the statute as amended, and judgment was also awarded against the city in favor of Neota Camp and Nora Lee Meyer for $30 each, being the amount of excess tuition paid by each for the year 1928–1929. From this judgment defendants have appealed.

The several propositions urged for reversal by defendants may be reduced to this contention: That the provisions of the statute objected to contravene the uniformity and equality of taxation provision of the Constitution (section 1, art. 8), and also, the due process of law provision of both the state and Federal Constitutions.

Plaintiffs, on the other hand, contend that the statute is valid and its enactment was authorized by section 1, art. 7, of the Constitution, reading as follows: "A general diffusion of knowledge, being essential to the preservation of the liberties and rights of the people, it shall be the duty of the legislature of the state to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

The Legislature has "a free hand in establishing independent school districts," as stated by Judge Gaines in State v. Brownson, 94 Tex. 440, 61 S. W. 114, 115; its discretion in the premises is as broad and comprehensive—

as the objects to be accomplished require. Machinery for an efficient system of public free schools has heretofore been set up by provisions, among others, for the formation of school districts, for schools therein, for buildings, maintenance tax, free text books, and for the management and control of said school, McPhail v. Tax Collector (Tex. Civ. App.) 280 S. W. 260, 263; Terrell v. Clifton Independent School Dist. (Tex. Civ. App.) 5 S.W.(2d) 808; El Dorado Independent School Dist. v. Tisdale (Tex. Com. App.) 3 S.W.(2d) 420, 422; and the Legislature may, within constitutional limitations, provide, as was attempted by the enactment in question, that where a school, of any named class, is not maintained in a particular district, resident scholastics may attend schools of that class in a neighboring district, the expense incident to their attendance to be borne by their home district. We do not believe, however, that it was ever, even remotely contemplated by the makers of our Constitution that, however essential a general diffusion of knowledge is to the preservation of liberties and rights, this essential purpose should be accomplished in disregard of other, equally sacred, provisions of the Constitution.

It is obvious that this statute permits a high school student, resident of a district not furnishing high school training, to choose the school he desires to attend; thereupon it becomes the duty of the superintendent, of the school chosen, to properly grade the student, and it becomes the duty of said district to furnish high school instruction for a tuition fee not to exceed $7.50 (in the original act $5) per month. While the statute provides that the rate of tuition shall be the actual costs of teaching service (exclusive of all other current or fixed charges), to be agreed upon by the trustees of the receiving district and the county board of school trustees, and, in case of disagreement, to be fixed by the state superintendment of public instruction, subject to the right of appeal to the state board of education, yet the fee, however fixed—whether by agreement, by the state superintendent, or by the state board of education—cannot exceed $7.50 per month. The school authorities of the school chosen by the student are given no voice in the matter, but are compelled to furnish necessary facilities and teaching service, and this without regard to its actual costs, or the adequacy of facilities provided for the accommodation of resident students.

The agreed facts show that the costs to the city of Dallas per high school student per month, for the scholastic year 1926–1927, was $13.02, for the year 1927–1928 it was $12.02, and for the year 1928–1929 it was $13; that the cost of instructional service alone, per student per month, for the scholastic year 1926–1927, was $10.39, for the year 1927–1928 it was $10.22, and for the year 1928–1929 it was $10.85. It is further shown that the high schools of the city are crowded to capacity with resident students; that the crowded condition of North Dallas High School necessitated the transfer of students to other high schools of the city, to their inconvenience and added costs, and that any overcrowding of schools is detrimental to and retards the efficiency of instruction; that it has been necessary for the city of Dallas to spend many million dollars in providing building sites, buildings, apparatus, and other equipment used in maintaining schools; that it has outstanding approximately $7,104,650 in bonds, the proceeds of which were expended for the acquisition of such school properties as are mentioned above; that these bonds must be discharged, principal and interest, by the levy and collection of local taxes; that neither the funding of said bonded indebtedness, nor the costs of building sites, buildings, apparatus, and equipment are estimated in determining the actual cost per capita per month of educating students in its high schools, as above mentioned; that the city received from the state available school fund, on the basis of per capita apportionment, for the year 1927–1928, the sum of $702,942.50, and raised the same year by local taxation for school purposes the sum of $1,875,717.03, and for the year 1928–1929 it received from the available school fund $724,869, and raised by local taxation $2,134,193.60. Thus it is apparent that it has cost the city, in the past, decidedly more per month to educate high school students than the maximum amount authorized to be collected under the provisions of this statute, and the conclusion is inescapable that these conditions will continue substantially as they now exist, and that, in order to furnish high school education for students in the future, it will cost the city decidedly more per capita per month than the maximum amount ($7.50) authorized by the statute.

To sustain the provisions of the statute under consideration, and hold that school facilities and teaching service provided by the city of Dallas for resident scholastics shall be made available to high school students of other districts at less than actual costs of the service, and without reference to the adequacy of facilities provided for the accommodation of resident students, would, in our opinion, be to disregard the constitutional provisions hereinbefore mentioned.

The case nearest in point from our own courts is Slocomb v. Cameron, etc., District, 116 Tex. 288, 288 S. W. 1064, 1065. That suit arose under an act of the Legislature providing that: "Any child lawfully enrolled in any district, or independent district, may be transferred to the enrollment of any other district, or independent district, in the same county, upon the written application of the parent or guardian or person having the lawful control of such child, filed with the county superintendent * * *. Upon the transfer of any child, its portion of the school funds shall

follow and be paid over to the district, or independent district, to which such child is transferred * * *."

On application of parents, scholastics from other districts were transferred to the Cameron district. The school trustees, however, adopted a resolution fixing a charge of $50 per year for nonresident high school students, and $32 per year for students below the high school grade, each student to be credited with $14, the amount apportioned from the state available school fund, and payment of the excess charge was made a condition precedent to their right to attend the Cameron schools. Parents of the children refused to pay any charge in excess of the amount apportioned from the state available school fund, and brought suit to enjoin the school authorities from demanding or collecting the charge fixed by them, from disbarring their children from the schools, and to compel the authorities to allow the children to continue and receive in the schools the same rights and privileges accorded other children.

The case reached the Supreme Court on certified question, which was answered by section B of the commission (approved by the Supreme Court). The court said: "In answering the question certified, we limit our reply to the specific question propounded. In other words, the Cameron district is willing to accept these transfers, provided they pay the tuition charged. Therefore the concrete question in the case is, as stated in the certificate, whether or not the Cameron independent school district has authority under the Constitution and laws of the state to charge tuition to such transferred scholastic as a condition precedent to the right to attend the public schools of that city. * * * It is our view that the Legislature, in enacting this article, did not intend to require any independent school district in this state to educate a scholastic free of charge any longer than the funds transferred with such scholastic would pay such pupil's proportionate part of the expense of operating the schools of such district. In other words, as long as the state apportionment will operate the schools of an independent district, the transfer pupil, whose state apportionment is also transferred, is not required to pay tuition. But, when the schools of an independent district must continue their term with money raised by local taxes levied upon property within such district, then the transfer pupil, a nonresident of such district, must pay a reasonable tuition * * *. The state should not, in all fairness, ask local districts to pay its bills. It should not be held to intend to not only command a local district to educate outsiders, but to do so at the expense of such local district. It is not equitable, under any circumstances, to force another to pay your obligations."

It will be observed that the court did not pass upon the constitutionality of the statute, as that question was not certified, in fact, the court held that the statute authorized the Cameron district to make the payment of excess tuition a condition precedent to the enrollment and teaching of students from other districts. However, the strong language denunciatory of inequalities, such as characterize the provisions under review, indicates clearly what the holding of the court would have been, if the statute then under consideration had been construed to contain similar provisions. Statutes of the nature of the one under consideration have been uniformly condemned in other states. See High School District v. Lancaster County, 60 Neb. 147, 82 N. W. 380, 382, 49 L. R. A. 343, 83 Am. St. Rep. 525; Board of Education v. Haworth, 274 Ill. 538, 113 N. E. 939; Todd v. Board of Education, 54 N. D. 235, 209 N. W. 369, 371; Irvin v. Gregory, 86 Ga. 605, 13 S. E. 120, 122.

In the case of Todd v. Board of Education, supra, the Supreme Court of North Dakota had under consideration the validity of a statute enacted under provisions of a Constitution, in substance the same as our own. That court said: "Const. §§ 147 and 148, requires the establishment and maintenance by the state of a uniform system of free public schools, but this requirement is satisfied by provision for the creation of school districts and for a uniform system of schools in those districts. See 24 R. C. L. 559 et seq.; 35 Cyc. 998 et seq. The constitutional requirement surely does not contemplate that school facilities provided in any district by means of taxes imposed therein shall be available to pupils from other districts without charge. To hold that it does would require that the constitutional guaranty of uniformity of taxation be disregarded. See High School District v. Lancaster County, 60 Neb. 147, 82 N. W. 380, 49 L. R. A. 343, 83 Am. St. Rep. 525; Wilkinson v. Lord, 85 Neb. 136, 122 N. W. 699, 24 L. R. A. (N. S.) 1104."

In High School District v. Lancaster, supra, the Supreme Court of Nebraska, passing upon an act of their Legislature, containing similar provisions to those under consideration, said: "For the purposes of this case, assume that the 75 cents per week allowed to be collected by the act from the county generally be insufficient to meet the expenses of educating the nonresident pupils in a given high-school district; it is plain this difference must be made good by levying and collecting taxes on the property of the taxpayers resident in the school district, and this difference cannot be collected from taxpayers of the whole county. Then the taxpayers within the school district will pay a greater proportion of these taxes than would those residing within the county, but outside the school district; and, while the valuation of the property of those within the school district and those without it might be uniform, yet the rate of taxation, for the same purpose, would be higher on the property within, than that upon

that without, the school district. Again, assume that the 75 cents per week exceeds the cost of tuition of such nonresident pupils; then the excess would accrue to the high-school districts, and the taxpayers thereof would profit at the expense of those outside of the limits of the high-school district, and in either case the rule of uniformity prescribed in section 6 of said article of the constitution would be violated—indirectly, perhaps, but it would be violated."

In Irvin v. Gregory, supra, the Supreme Court of Georgia had under consideration a statute authorizing the establishment of public schools in a town, and providing that the local school board might admit pupils, nonresidents of the town, on terms prescribed by the board. The court held that this authority did not authorize the board to prescribe terms which would cast upon the town, or its inhabitants, any part of the expense of educating nonresident pupils, that such pupils could not be received at a less rate per scholar than the inhabitants of the town pay by taxation for their children, nor could they be received at all to the exclusion of resident children who would otherwise attend.

We do not think it can be correctly said that the Legislature has the authority to impose taxes on property within an independent school district for the express purpose of furnishing high school facilities and instructional service to students of other districts, and yet that result is precisely what the provisions of this statute would accomplish, if executed. This result can neither be attained directly, nor accomplished indirectly. The rule announced in 6 R. C. L. 78, § 76, amply supported by authorities (see note 1), is that: "The duty of the courts to declare void any statute which violates the Constitution is not limited to direct violations, but extends to any evasion or indirection which may be practiced by the Legislature."

The agreed facts show that the withdrawal of the student involved in the suit would not result in the reduction of expense to the city. This may be true under existing circumstances, yet the necessary effect of the statute is to attract from over the state students who cannot obtain high school training in their home districts, and, if the city is compelled to take care of an influx of nonresident students, its already scant facilities will have to be enlarged and the teaching force increased, requiring additional tax burdens upon taxpayers of the district. We are of opinion, therefore, that the necessary effect of the objectionable provisions of the statute is to impose local tax burdens, and to deprive taxpayers of said districts of property without due process of law to furnish education to students of other districts. Therefore we hold that the statute, in so far as it attempts to coerce high school districts by forcing them without voice or hearing to furnish, at local expense, educational facilities and service to nonresident high school students at less than actual costs, is in contravention of the constitutional provision (section 1, art. 8) that guarantees equality and uniformity in taxation, and section 19, art. 1, that prohibits any citizen from being deprived of property except by due course of the law of the land.

However, with these objectionable provisions expunged, the statute, in our opinion, is left workable, and its dominant provisions may nevertheless be carried out; hence the presumption will be indulged that the Legislature would have enacted the statute even in the absence of the objectionable provisions. The rule on this subject is stated in 6 R. C. L. 123, § 122, as follows: "The question as to whether portions of a statute which are constitutional shall be upheld while other divisible portions are eliminated as unconstitutional is primarily one of intention. If the objectionable parts of a statute are severable from the rest in such a way that the Legislature would be presumed to have enacted the valid portion without the invalid, the failure of the latter will not necessarily render the entire statute invalid, but the statute may be enforced as to those portions of it which are constitutional."

The paramount purpose of the Legislature, highly commendable and its accomplishment of growing importance, was to provide free tuition for high school students who cannot receive such instruction in their home districts. If the objectionable parts of the statute are severed from the rest, the county board may still classify the schools, and high school students who cannot receive instruction in their home districts may enroll in and receive such instruction in other districts, on terms to be agreed upon or arrived at under the provisions of the statute, due regard being given to the adequacy of facilities of the receiving district to accommodate resident students. The statute, as deleted, may not furnish the best solution of this important problem, but we do not think a district could, in any event, be compelled to furnish instructional service to nonresident students, at less than actual costs, or in disregard of the adequacy of its facilities to accommodate local students. In harmony with these views, we reverse the judgment of the court below, and render judgment for appellants.

Reversed and rendered.